Sims Bros., Inc., Appellant, *v.* Tracy, Tax Commissioner, Appellee.

[Cite as *Sims Bros., Inc. v. Tracy* (1998), 83 Ohio St.3d 162.]

(No. 97–1328—Submitted May 27, 1998—Decided September 23, 1998.)

*Squire, Sanders & Dempsey* and *Ted B. Clevenger*, for appellant.

*Betty D. Montgomery,* Attorney General, and *Richard C. Farrin,* Assistant Attorney General, for appellee.

**MOYER, C.J.** R.C. 5739.01(E) provides an exception to the sales and use tax. During the first audit period, the exception applied to property purchased by the consumer with the intent to "use or consume the thing transferred directly in the production of tangible personal property * * * for sale by manufacturing, [or] processing * * *." Former R.C. 5739.01(E)(2). During the second audit period, the exception applied to property purchased by the consumer with the intent to "use the thing transferred * * * primarily in a manufacturing operation to produce tangible personal property for sale." Former R.C. 5739.01(E)(10), now renumbered R.C. 5739.01(E)(9).

Sims argues that the cranes and crane repairs at issue qualify for exemption under both the current and former versions of the manufacturing exception. Sims argues that its mixing, blending, and sorting of scrap to meet its customers' desires as to density and chemistry of the final product constitute manufacturing. The commissioner asserts that these operations are not manufacturing.

We reject Sims's arguments and affirm the Board of Tax Appeals.

Second Audit Period. We first review the commissioner's order as to the July 1, 1990 to March 31, 1992 audit period, during which the current version of the statutory manufacturing exception was in effect. Current R.C. 5739.01(S) defines "manufacturing operation" as "a process in which materials are *changed, converted, or transformed into a different state or form* from which they previously existed *and includes* refining materials, assembling parts, and *preparing raw materials and parts by mixing, measuring, blending, or otherwise committing such materials or parts to the manufacturing process.* \* \* \*" (Emphasis added.)

Sims argues that it uses the cranes to "mix" or "blend" the scrap metal in preparation for baling and sale. However, we do not accept Sims's implied contention that *any* mixing or blending that occurs in connection with manufacturing falls within the current statutory definition of a "manufacturing operation."

The statute does not provide that a manufacturing operation includes the preparation of raw materials by "mixing, measuring, blending, *or* committing such materials or parts to the manufacturing process." Rather, the statute reads "mixing, measuring, blending, *or otherwise* committing such materials or parts to the manufacturing process." (Emphasis added.) Substituting a dictionary definition of the word "otherwise" for the word itself, the statute may be read: " 'Manufacturing operation' means a process in which materials are changed, converted, or transformed into a different state or form from which they previously existed and includes \* \* \* preparing raw materials and parts by *mixing, measuring, blending or [in a different way or manner, under other conditions, or under different circumstances]* committing such materials or parts to the manufacturing process." (Emphasis added.) Webster's Third New International Dictionary (1986) 1598. Inclusion of the phrase "or otherwise" thus modifies and limits the types of mixing, measuring, and blending to be included in the definition of "manufacturing operation."

We therefore hold that property used to mix, measure, or blend raw materials is not exempt from use tax as property used "primarily in a manufacturing operation to produce tangible personal property for sale," unless the mixing, measuring, or blending is of a nature which results in the materials or parts becoming committed to the manufacturing process.

The word "commit" in the statute reflects a legislative intent that materials be deemed part of the manufacturing process only at that point in time at which constituent materials are changed in such a manner that their original form is altered, such as when a liquid and solid are mixed to create a solution. At that point, the individual components are no longer distinct entities and, for purposes of the statutory exemption, have been "committed" to the process of becoming a new manufactured good.

Our conclusion is reinforced by the first phrase of the statutory definition, which refers to "manufacturing operation" as a "process in which materials are changed, converted, or transformed into a different state or form from which they previously existed." R.C. 5739.01(S). We do not accept the contention that mixing or blending alone satisfies the statutory definition, as to do so would be to disregard this earlier part of the statutory definition, and would be in violation of our duty to give meaning to all portions of a statute.

In applying this holding to the case before us, we conclude that Sims's use of cranes did not involve activities in which mixing, measuring, or blending resulted in raw materials becoming committed to the manufacturing process, nor were they used in processes in which materials were "changed, converted, or transformed into a different state or form from which they previously existed." R.C. 5739.01(S). We agree with the commissioner's conclusion (based on the holding in *Warren Scrap Co. v. Limbach* [July 10, 1992], Trumbull App. No. 91–T–4571, unreported, 1992 WL 165128) that, in the scrap metal business, the manufacturing process includes processes such as actual compression, crushing, baling, and torching. In addition, Sims's actual shearing activities would appear to be a manufacturing process. But Sims's use of cranes to load and unload its baling and shearing machines does not involve such a change, conversion, or transformation and constitutes uses prior to and subsequent to manufacturing. Rather, the record supports the conclusion that the scrap metal could have been retrieved and resorted at any point prior to actual operation of the baling and shearing machines. Therefore, use of the cranes to sort and load materials into those machines does not qualify for exemption. See, also, *Scholz Homes, Inc. v. Porterfield* (1971), 25 Ohio St.2d 67, 54 O.O.2d 199, 266 N.E.2d 834.

First Audit Period. Similarly, during the first audit period, former R.C. 5739.01(R)(1) required a "commitment" of raw materials to manufacturing in order to trigger the exception. That statute defined "manufacturing" or "processing" as "the transformation or conversion of materials or things into a different state or form from that in which they originally existed. Manufacturing or processing begins at the point where the transformation or conversion commences, or at the point where raw materials *are committed* to the manufacturing process in a receptacle by being measured, mixed, or blended, whichever occurs first, and it ends when the product is completed." (Emphasis added.) Because the cranes at issue were used prior to such a commitment and after conclusion of the manufacturing process, the cranes were not used directly in the production of tangible personal property for sale, and were not exempt from tax.

Moreover, former R.C. 5739.01(R)(1), in effect during the first audit period, provided that manufacturing or processing begins "where raw materials are committed to the manufacturing process *in a receptacle* by being measured,

mixed, or blended." (Emphasis added.) Here, Sims mixed the raw materials for baling and shearing on the ground at the machine where transformation or conversion occurred. Sims did not mix the materials "in a receptacle," thus providing an additional reason why Sims's use of the cranes did not fall within the manufacturing exception during the first audit period.

"Materials Handling Equipment" Exemption. We reject as well Sims's final contention of exemption, under former R.C. 5739.02(B)(16) or current R.C. 5739.011(B)(2), as materials handling equipment. The exemption under these statutes applies to equipment that moves the product through a continuous manufacturing operation. However, the instant equipment mixes raw materials prior to insertion into the actual transformation operation. The cranes do not, however, move the product through a continuous manufacturing operation. After baling or shearing, the cranes move the finished products further; however, this is after manufacturing has ended. Consequently, the materials handling exemption does not apply.

The decision of the Board of Tax Appeals is reasonable and lawful and is therefore affirmed.

*Decision affirmed.*

DOUGLAS, RESNICK, F.E. SWEENEY and COOK, JJ., concur.

PFEIFER and LUNDBERG STRATTON, JJ., dissent.

---

PFEIFER, J., dissenting. The cranes used by Sims Bros. to sort and mix scrap metal are an integral part of Sims's manufacturing operation. While the preparation and consolidation of scrap metals is not an entirely complex form of manufacturing, the majority does not dispute that it is indeed manufacturing. That process begins when Sims, through use of its cranes, mixes and blends the assorted metals into piles containing metals of similar composition. This is the most important part of Sims's manufacturing process. It is, indeed, *most* of the process. It is the beginning and the *sine qua non* of the manufacturing Sims does. The work the cranes do commits the metal to the manufacturing process. The cranes therefore meet the statutory exemption from use tax.

LUNDBERG STRATTON, J., concurs in the foregoing dissenting opinion.