[This opinion has been published in *Ohio Official Reports* at 83 Ohio St.3d 162.]

SIMS BROS., INC., APPELLANT, *v.* TRACY, TAX COMMISSIONER, APPELLEE.

[Cite as *Sims Bros., Inc. v. Tracy*, 1998-Ohio-116.]

*Taxation—Use tax on cranes used to recycle scrap metals for sale to steel mills and foundries for melting and reuse—Former R.C. 5739.01(E)(10) and R.C. 5739.01(S), construed and followed.*

Property used to mix, measure, or blend raw materials is not exempt from use tax as property used "primarily in a manufacturing operation to produce tangible personal property for sale," unless the mixing, measuring, or blending is of a nature that results in the materials or parts becoming committed to the manufacturing process. (Former R.C. 5739.01[E][10] and 5739.01[S], construed and followed.)

(No. 97-1328—Submitted May 27, 1998—Decided September 23, 1998.)

APPEAL from the Board of Tax Appeals, Nos. 95-K-796 and 95-K-797.

———————————

{¶ 1} Appellant, Sims Bros., Inc. ("Sims"), recycles scrap metals for sale to steel mills and foundries for melting and reuse. It obtains scrap metals from various sources, including two major manufacturing suppliers: Honda, which sells Sims stamping material scrapped from car doors, and Whirlpool, Inc., which sells it scrap dishwasher racks. Before sale, Sims bales, shears, or blends the material to achieve the desired chemistry and density as ordered by its customers.

{¶ 2} When scrap material is received, Sims's employees either dump it in the areas of the baling and shearing machines, in a blending area, or in a general sorting area. At the sorting area, Sims separates the material into various grades, places the material in front-end loaders, and moves the material to the operating areas. Sims employs electromagnetic cranes to pick up the scrap metals in all the operations. Sims interchanges the cranes throughout the operations.

**{¶ 3}** At the baler, Sims separates like material into piles. Sims mixes the materials for its customers by directing its crane operator to pick up predetermined amounts of scrap from individual piles, each containing different material, and deposit the scrap on the ground in front of the baler. The operator then picks up the load and places it into a metal box attached to the baler, and the baler compresses the material into a two-foot by two-foot by three-foot bale that weighs approximately one thousand pounds. Sims places the bales into stockpiles for shipment and selectively loads bales on trucks for its customers, blending the materials further.

**{¶ 4}** At the shearing machine, Sims performs the same mixing operations on the ground, picks up the material with the crane, and drops the material either into the charging box attached to the shearer or onto the shearer table. A ramming device then pushes the material under a series of blades, which chop the scrap into smaller sizes. After shearing, Sims picks up the material with cranes and loads it for shipment.

**{¶ 5}** In blending scrap metal, Sims uses cranes to mix materials from various piles that have been dumped at the location. The crane operators select materials from the various piles and place the material on a truck for shipment. Sims does not compress or shear scrap as part of its blending operation.

**{¶ 6}** The Tax Commissioner audited Sims for purchases of cranes and crane repairs made from July 1, 1988, through March 31, 1992, but considered Sims's crane purchases separately for the periods July 1, 1988, through June 30, 1990, and July 1, 1990, through March 31, 1992. The commissioner divided its auditing activities into two audit periods in recognition of the enactment of Am.H.B. No. 531, which changed the statutory language of the manufacturing exception, effective July 1, 1990. (143 Ohio Laws, Part IV, 5570, 5572-5573.)

**{¶ 7}** Sims contended that its use of cranes was exempt from tax based on the manufacturing exceptions in effect during each audit period. The commissioner determined that the cranes did not qualify for exception under either the former or current versions of the statutory manufacturing exception. As to the first audit period,

the commissioner determined that "[Sims's] use of its cranes to move raw materials for busheling and for loading its processing machines is not part of manufacturing because it occurs prior to manufacturing. Therefore, the cranes are not used directly in manufacturing." As to the second audit period, the commissioner concluded that "the manufacturing operation begins when the raw materials are committed to the manufacturing process. * * * Selecting scrap and moving it from storage piles does not constitute mixing or blending. Instead, the cranes are being used to move raw material from its initial storage, prior to the point of commitment," and further concluded that "[Sims's] use of its cranes to move raw materials for busheling and for loading its processing machines is not part of the manufacturing operation; it is prior to the point of commitment. Therefore, the cranes are not used primarily in manufacturing operation."

{¶ 8} Sims appealed the commissioner's orders to the Board of Tax Appeals ("BTA").

{¶ 9} The BTA affirmed the commissioner's orders. The BTA concluded that "retrieving scrap materials from piles, placing them into the baler or shearer and loading finished product onto trucks for delivery, does not constitute a use within the manufacturing process." Thus, according to the BTA, moving the scrap material around Sims's scrap yard was not manufacturing.

{¶ 10} The cause is now before this court upon an appeal as of right.

————————————

*Squire, Sanders & Dempsey* and *Ted B. Clevenger*, for appellant.

*Betty D. Montgomery*, Attorney General, and *Richard C. Farrin*, Assistant Attorney General, for appellee.

————————————

**MOYER, C.J.**

{¶ 11} R.C. 5739.01(E) provides an exception to the sales and use tax. During the first audit period, the exception applied to property purchased by the consumer with the intent to "use or consume the thing transferred directly in the production of tangible personal property * * * for sale by manufacturing, [or] processing * * *." Former R.C. 5739.01(E)(2). During the second audit period, the exception applied to property purchased by the consumer with the intent to "use the thing transferred * * * primarily in a manufacturing operation to produce tangible personal property for sale." Former R.C. 5739.01(E)(10), now renumbered R.C. 5739.01(E)(9).

{¶ 12} Sims argues that the cranes and crane repairs at issue qualify for exemption under both the current and former versions of the manufacturing exception. Sims argues that its mixing, blending, and sorting of scrap to meet its customers' desires as to density and chemistry of the final product constitute manufacturing. The commissioner asserts that these operations are not manufacturing.

{¶ 13} We reject Sims's arguments and affirm the Board of Tax Appeals.

{¶ 14} <u>Second Audit Period</u>. We first review the commissioner's order as to the July 1, 1990 to March 31, 1992 audit period, during which the current version of the statutory manufacturing exception was in effect. Current R.C. 5739.01(S) defines "manufacturing operation" as "a process in which materials are *changed, converted, or transformed into a different state or form* from which they previously existed *and includes* refining materials, assembling parts, and *preparing raw materials and parts by mixing, measuring, blending, or otherwise committing such materials or parts to the manufacturing process*. * * *" (Emphasis added.)

{¶ 15} Sims argues that it uses the cranes to "mix" or "blend" the scrap metal in preparation for baling and sale. However, we do not accept Sims's implied contention that *any* mixing or blending that occurs in connection with manufacturing falls within the current statutory definition of a "manufacturing operation."

4

{¶ 16} The statute does not provide that a manufacturing operation includes the preparation of raw materials by "mixing, measuring, blending, *or* committing such materials or parts to the manufacturing process." Rather, the statute reads "mixing, measuring, blending, *or otherwise* committing such materials or parts to the manufacturing process." (Emphasis added.) Substituting a dictionary definition of the word "otherwise" for the word itself, the statute may be read: " 'Manufacturing operation' means a process in which materials are changed, converted, or transformed into a different state or form from which they previously existed and includes * * * preparing raw materials and parts by *mixing, measuring, blending or* [*in a different way or manner, under other conditions, or under different circumstances*] committing such materials or parts to the manufacturing process." (Emphasis added.) Webster's Third New International Dictionary (1986) 1598. Inclusion of the phrase "or otherwise" thus modifies and limits the types of mixing, measuring, and blending to be included in the definition of "manufacturing operation."

{¶ 17} We therefore hold that property used to mix, measure, or blend raw materials is not exempt from use tax as property used "primarily in a manufacturing operation to produce tangible personal property for sale," unless the mixing, measuring, or blending is of a nature which results in the materials or parts becoming committed to the manufacturing process.

{¶ 18} The word "commit" in the statute reflects a legislative intent that materials be deemed part of the manufacturing process only at that point in time at which constituent materials are changed in such a manner that their original form is altered, such as when a liquid and solid are mixed to create a solution. At that point, the individual components are no longer distinct entities and, for purposes of the statutory exemption, have been "committed" to the process of becoming a new manufactured good.

**{¶ 19}** Our conclusion is reinforced by the first phrase of the statutory definition, which refers to "manufacturing operation" as a "process in which materials are changed, converted, or transformed into a different state or form from which they previously existed." R.C. 5739.01(S). We do not accept the contention that mixing or blending alone satisfies the statutory definition, as to do so would be to disregard this earlier part of the statutory definition, and would be in violation of our duty to give meaning to all portions of a statute.

**{¶ 20}** In applying this holding to the case before us, we conclude that Sims's use of cranes did not involve activities in which mixing, measuring, or blending resulted in raw materials becoming committed to the manufacturing process, nor were they used in processes in which materials were "changed, converted, or transformed into a different state or form from which they previously existed." R.C. 5739.01(S). We agree with the commissioner's conclusion (based on the holding in *Warren Scrap Co. v. Limbach* [July 10, 1992], Trumbull App. No. 91-T-4571, unreported, 1992 WL 165128) that, in the scrap metal business, the manufacturing process includes processes such as actual compression, crushing, baling, and torching. In addition, Sims's actual shearing activities would appear to be a manufacturing process. But Sims's use of cranes to load and unload its baling and shearing machines does not involve such a change, conversion, or transformation and constitutes uses prior to and subsequent to manufacturing. Rather, the record supports the conclusion that the scrap metal could have been retrieved and resorted at any point prior to actual operation of the baling and shearing machines. Therefore, use of the cranes to sort and load materials into those machines does not qualify for exemption. See, also, *Scholz Homes, Inc. v. Porterfield* (1971), 25 Ohio St.2d 67, 54 O.O.2d 199, 266 N.E.2d 834.

**{¶ 21}** First Audit Period. Similarly, during the first audit period, former R.C. 5739.01(R)(1) required a "commitment" of raw materials to manufacturing in order to trigger the exception. That statute defined "manufacturing" or "processing" as "the transformation or conversion of materials or things into a different state or form from

that in which they originally existed. Manufacturing or processing begins at the point where the transformation or conversion commences, or at the point where raw materials *are committed* to the manufacturing process in a receptacle by being measured, mixed, or blended, whichever occurs first, and it ends when the product is completed." (Emphasis added.) Because the cranes at issue were used prior to such a commitment and after conclusion of the manufacturing process, the cranes were not used directly in the production of tangible personal property for sale, and were not exempt from tax.

{¶ 22} Moreover, former R.C. 5739.01(R)(1), in effect during the first audit period, provided that manufacturing or processing begins "where raw materials are committed to the manufacturing process *in a receptacle* by being measured, mixed, or blended." (Emphasis added.) Here, Sims mixed the raw materials for baling and shearing on the ground at the machine where transformation or conversion occurred. Sims did not mix the materials "in a receptacle," thus providing an additional reason why Sims's use of the cranes did not fall within the manufacturing exception during the first audit period.

{¶ 23} <u>"Materials Handling Equipment" Exemption</u>. We reject as well Sims's final contention of exemption, under former R.C. 5739.02(B)(16) or current R.C. 5739.011(B)(2), as materials handling equipment. The exemption under these statutes applies to equipment that moves the product through a continuous manufacturing operation. However, the instant equipment mixes raw materials prior to insertion into the actual transformation operation. The cranes do not, however, move the product through a continuous manufacturing operation. After baling or shearing, the cranes move the finished products further; however, this is after manufacturing has ended. Consequently, the materials handling exemption does not apply.

{¶ 24} The decision of the Board of Tax Appeals is reasonable and lawful and is therefore affirmed.

*Decision affirmed.*

DOUGLAS, RESNICK, F.E. SWEENEY and COOK, JJ., concur.

PFEIFER and LUNDBERG STRATTON, JJ., dissent.

———————————

**PFEIFER, J., dissenting.**

{¶ 25} The cranes used by Sims Bros. to sort and mix scrap metal are an integral part of Sims's manufacturing operation. While the preparation and consolidation of scrap metals is not an entirely complex form of manufacturing, the majority does not dispute that it is indeed manufacturing. That process begins when Sims, through use of its cranes, mixes and blends the assorted metals into piles containing metals of similar composition. This is the most important part of Sims's manufacturing process. It is, indeed, *most* of the process. It is the beginning and the *sine qua non* of the manufacturing Sims does. The work the cranes do commits the metal to the manufacturing process. The cranes therefore meet the statutory exemption from use tax.

LUNDBERG STRATTON, J., concurs in the foregoing dissenting opinion.

———————————